# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| BRINAL KAUL, Individually and on behalf of all others similarly situated, | Case No: |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| v. | JURY TRIAL DEMANDED |
| CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, JOSEPH WAGNER, CHAMATH PALIHAPITIYA, STEVEN TRIEU, IAN OSBORNE, JACQUELINE D. RESES, and JAMES RYANS, | |
| Defendants. | |

Plaintiff Brinal Kaul ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clover Health Investments, Corp. ("Clover" or the "Company") f/k/a Social Capital Hedosophia Holdings Corp. III, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who: (1) purchased or otherwise acquired publicly traded Clover securities between October 6, 2020 and February 4, 2021, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act"); and/or (2) purchased or otherwise acquired Clover securities pursuant or traceable to the Company's registration statement and prospectus issued in connection with the December 2020 Merger, seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5) and Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, §22 of the Securities Act, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), §22 of the Securities Act, and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) as the Company is headquartered in this judicial district, and the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired Clover securities during the Class Period and/or purchased or otherwise acquired Clover securities pursuant or traceable to the Company's registration statement and prospectus issued in connection with the December 2020 Merger and was economically damaged thereby.

7.     Defendant Clover purports to provide health insurance services. Clover is incorporated in Delaware with headquarters at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee. Clover was taken public through a reverse merger with Social Capital Hedosophia Holdings Corp. III ("IPOC"), a Special Purpose Acquisition Company (the "Business Combination"). Prior to the Business Combination, IPOC traded on the New York Stock Exchange ("NYSE") under the ticker "IPOC." On January 8, 2021, Clover's common shares began trading on the NASDAQ under the ticker symbol "CLOV," closing at $15.90 per share, and on January 11, Clover's redeemable warrants began trading on the NASDAQ under the ticker symbol "CLOVW," closing at $3.36 per warrant.

8.     Defendant Vivek Garipalli ("Garipalli") co-founded the Company, and has served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors throughout the Class Period.

9.     Defendant Joseph Wagner ("Wagner") has served as the Company's Chief Financial Officer ("CFO") throughout the Class Period.

3

10.     Defendants Garipalli and Wagner are collectively referred to herein as the "Clover Individual Defendants."

11.     Each of the Clover Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

12.     Clover is liable for the acts of the Clover Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

4

13. The scienter of the Clover Individual Defendants and other employees and agents of the Company is similarly imputed to Clover under *respondeat superior* and agency principles.

14. Defendant Chamath Palihapitiya ("Palihapitiya") was, at all relevant times, President, Chief Executive Officer, Chairman of the Board of IPOC. Palihapitiya signed or authorized the signing of the Registration Statement and Proxy Statement.

15. Defendant Steven Trieu ("Trieu") was, at all relevant times, CFO of IPOC. Trieu signed or authorized the signing of the Registration Statement and Proxy Statement.

16. Defendant Ian Osborne ("Osborne") was, at all relevant times, President and Director of IPOC. Osborne signed or authorized the signing of the Registration Statement and Proxy Statement.

17. Defendant Jacqueline D. Reses ("Reses") was, at all relevant times, a Director of IPOC. Reses signed or authorized the signing of the Registration Statement and Proxy Statement.

18. Defendant James Ryans ("Ryans") was, at all relevant times, a Director of IPOC. Ryans signed or authorized the signing of the Registration Statement and Proxy Statement.

19. Defendants Palihapitiya, Trieu, Reses, and Ryans (collectively, the "IPOC Director Defendants"), participated in Board meetings and conference calls, voted to approve the merger, signed and/or authorized the signing of the Registration Statement, Proxy, approved the Proxy, solicited approval of the Merger through the Board's recommendation that IPOC shareholders vote in favor the merger with Clover, which appeared in the Proxy, and permitted the use of their names in connection with the solicitation of proxies from the shareholders. In their capacities as signatories of documents set forth below, as well as by virtue of their

5

authority to approve the Merger, the IPOC Director Defendants possessed the power and authority to control the contents of the Registration Statement, Proxy/Prospectus, as well as IPOC's and the Company's press releases, investor and media presentations, and other SEC filings.

20.     Defendants Clover, the Clover Individual Defendants, and the IPOC Director Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

21.     On October 6, 2020, Clover issued a press release announcing its intention to become a public company through a merger with IPOC. The press release stated, in pertinent part, the following concerning the Clover Assistant, Clover's platform:

> Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes.

> The Clover Assistant enables a virtuous growth cycle, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. In turn, the Company believes its best-in-class plans will continue to deliver market-leading growth, allowing the Clover Assistant to capture and synthesize more data and ultimately drive better care.

> Medicare Advantage is one of the largest and fastest growing markets in the U.S. healthcare system – but it is one that has seen little innovation and remains ripe for disruption. Worth $270 billion today and with an estimated value of $590 billion by 2025, the Medicare Advantage market provides a tremendous opportunity for growth.

> Today, Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach,

6

Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare-eligibles in eight Georgia counties.

22.     That same day, in an interview discussing the Business Combination, Defendant Palihapitiya stated that Clover "create[s] transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid."

23.     On October 20, 2020, the Company filed its registration statement and preliminary proxy statement/prospectus on Form S-4 with the SEC (the "Registration Statement"). The Registration Statement was amended on December 9, 2020 and December 10, 2020, and was declared effective on December 11, 2020.

24.     The Registration Statement touted the Company's growth as strong and organic, stating, for example:

> We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.
>
> \*      \*      \*
>
> As a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members as of the end of the prior year. This expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period.
>
> \*      \*      \*

7

We've already seen a glimpse of what's possible. Clover currently offers Medicare Advantage plans in 7 states and 34 markets. Our "obvious" plans are among the most affordable in their markets. They generally offer the widest physician networks. As a result, they benefit from industry-leading organic growth, with a 38% annual growth rate compared to an 8% industry average.

25. The Registration Statement and proxy/prospectus stated the following concerning the Clover Assistant's usage by doctors:

The Clover Assistant delights and engages physicians. We are focused on empowering and delighting physicians that use our platform. Physicians are highly satisfied with the Clover Assistant platform, as evidenced by our platform's positive NPS of 64 for the three months ended June 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic and NextGen. Onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.

26. The Registration Statement and proxy/prospectus frequently touted the Company's plans as "best-in-class," stating, for example:

The SCH board of directors believes that Clover provides a fundamentally different approach to insurance, offering highly affordable, best-in-class plans that combine wide access to healthcare and supplemental benefits with low out-of-pocket expenses. Clover designs its plans to provide the access of a PPO at lower than HMO costs. Most of its members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with wide network access and with the same in-and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long-term care services in 2016. The SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care.

8

27.     The Registration Statement only stated the concerning the Company's risk of litigation or regulatory investigation with respect to its marketing practices:

> From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

> \*      \*      \*

> There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and

9

arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "Risk factors—Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

\*     \*     \*

As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits. The regulations and contractual requirements applicable to us and other participants in these programs are complex and subject to change. Although our compliance program is designed to meet all statutory and regulatory requirements, our policies and procedures are frequently under review and subject to updates, and our training and education programs continue to evolve.

The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.

We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal

government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA. Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

28.     The Registration Statement stated the following concerning the Company's sales and marketing practices:

We market our "Obvious" plans through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

29.     The Registration Statement stated the following concerning the Company's risk adjustment model, in pertinent part:

When individuals become eligible for Medicare coverage, they may elect to enroll directly with the federal government in what is commonly referred to as "Original Medicare," under which they are generally required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to providers. Alternatively, eligible consumers may elect each year to enroll in Medicare Advantage in markets where it is available. Under MA, consumers can shop annually and choose a private company to coordinate their health plan

11

benefits and care on behalf of the U.S. government. This model is consumer-friendly with low switching costs for members to choose the plan that suits their needs. In both Original Medicare and MA, the U.S. government is the ultimate insurer and pays for the cost of care. In MA, the U.S. government, through CMS, pays MA plans on a per member per month basis, which gives high visibility with respect to recurring revenue, making these plans similar to other subscription-based models. CMS also adjusts payments based on its risk adjustment model, which compensates plans for the health risk profile of their members, resulting in higher payments for sicker members who generally require more care, and provides the opportunity for sustainable plan economics regardless of a plan's member mix. The consumer-oriented nature and predictable payment model feature have resulted in the MA program achieving rapid adoption.

30. On December 11, 2020, the Company filed a proxy statement/prospectus for the purpose of soliciting approval of the merger at a meeting to be held on January 6, 2021. The proxy statement/prospectus made substantially similar statements as the Registration Statement.

31. The statements contained in ¶¶21-30 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Clover's was under active investigation by the Department of Justice for at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals; (2) the DOJ's investigation presented an existential risk to the Company, since it derives most of its revenues from Medicare; (3) Clover's sales were driven by a major undisclosed related party deal and misleading marketing targeting the elderly, not its purported "best-in-class" technology; (4) a significant portion of Clover sales were by way of an undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales; and (5) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

32.     On February 4, 2021, before market hours, Hindenburg Research published a research report that revealed that Clover's flagship platform, Clover Assistant, was the subject of a DOJ investigation for a variety of issues, including illegal kickbacks, marketing practices, and undisclosed related-party transactions.

33.     Hindenburg discovered that Clover's sales growth was not driven by technology, but by deceptive sales practices, stating, in pertinent part, the following:

> Based on conversations with former employees and a review of corporate and insurance filings, we found that Clover's membership growth looks to be driven not by technology, but rather by deceptive sales practices, including:
>
> 1.  A wholly owned Clover subsidiary that misleadingly markets itself as providing "independent" and "unbiased" advice to seniors looking for Medicare; and
> 2.  Large, undisclosed related-party transactions with a brokerage entity controlled by Clover's Head of Sales.
>
> As one former employee told us:
>
> "The technology wasn't any different. The plan design really wasn't any different aside from it undercut the competition. But the first couple of years in network, it wasn't even that great. They didn't have all the hospitals in network. So, **it had to have come from the sales strategy for their success to have grown organically the way it did**."
>
> Not surprisingly, the DOJ subpoena lists numerous issues related to Clover's member recruitment practices.

13

The general purpose for which this Civil Investigative Demand is issued is to discover your knowledge concerning the topics below. Herein, "Clover" means Clover Health Investment Corporation, Clover Health LLC, Clover Health Corp., Clover Insurance Company, and Clover Health Holdings, Inc., including their affiliates, subsidiaries, predecessors, and successors.

1. Clover's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans;

2. Clover's activities intended to encourage providers to refuse to accept patients with non-Clover coverage;

3. Clover's payments to providers' staff and employees (receptionists, office managers) for conveying any information relating to Clover plans to patients in providers' offices;

4. Clover's payments to providers' staff and employees for generating prospective patient leads for Clover plans;

5. "Clover Ambassadors;"

6. Clover's payments of $5 per referral of a prospective patient not already covered by a Clover plan;

7. Clover's distribution of gift cards to retail merchants for referral of prospective patients not already covered by a Clover plan;

8. Clover's payments to providers for services rendered to patients and/or to Clover;

9. Payments related to "Clover Assistant;"

10. Clover's patient recruitment efforts;

11. Clover's activities relating to matching patients with Medicare Advantage plans;

12. An online platform known as "Seek Medicare."

34.     The report also revealed that Clover's subsidiary, Seek Insurances Services, Inc., was representing that it was an "unbiased" and "independent" source of information that helped seniors select Medicare plans, despite being wholly-owned by Clover, and having the same Head of Sales:

> Seek Insurance Services, Inc. is a subsidiary of Clover, per Clover's SEC filing exhibit listing its subsidiaries.
>
> [image omitted]
>
> And Seek Insurance Services, Inc. is listed as the owner and operator of a website called SeekMedicare.com, which advises seniors on which Medicare insurance plans to choose.
>
> [image omitted].

14

(Source: Seek Medicare)

Given that the stated purpose of Seek's website is to help seniors pick Medicare insurance plans, we would expect it to disclose that it is actually *owned* by insurance company Clover, posing a major conflict of interest.

Yet Clover wasn't mentioned anywhere on Seek's website, per our review. On the contrary, Seek misleads its elderly audience by saying the exact opposite.

On one part of its website, superimposed over an image of a senior citizen, Seek explains how it offers totally unbiased advice:

[image omitted].

(Source: Seek Medicare home page)

Seek further markets itself as providing "**independent** advice that puts your well-being above all else".

[image omitted]

(Source: Seek Insurance "About" page)

Seek also insists that it doesn't care which insurance company plan seniors end up picking:

[image omitted]

(Source: Seek's "contact us" webpage)

Seek's website even has a blog post explaining how *other* brokers often have a bias to steer clients toward a plan that best serves their own financial interests. The post is titled "SeekMedicare is different" and repeatedly declares Seek's neutrality:

[image omitted]

(Source: Seek Blog Post)

Seek Medicare Website: "We Don't Work for Insurance Companies. We Work For You"

Reality: Seek Is Literally Owned By Clover Health, An Insurance Company

On one part of Seek's website, it explicitly claims that it doesn't work for an insurance company at all:

15

[image omitted]

(Source: Seek Insurance "About" Page.)
(Note: Seek Insurance works for, and is literally owned by, insurance company Clover Health)

Seek's website doesn't list its executive team. But in case there is any doubt that Seek is an extension of Clover's sales operation, Florida corporate records show that Seek's Chief Sales Officer is Hiram Bermudez, who concurrently serves as Clover's Head of Sales, per his LinkedIn profile.

Seek's website doesn't list an address, but New Jersey corporate documents show its address matches Clover's New Jersey office address: 30 Montgomery Street, Jersey City, NJ, 15th Floor.

35. The report also alleged that Clover's sales were primarily fueled by an undisclosed relationship between Clover and an outside brokerage controlled by Clover's head of sales:

Several former employees, a local competitor, and an independent broker told us that Bermudez oversaw the company's aggressive expansion across New Jersey. One former employee estimated that Bermudez was responsible for at least 70% of the sales in the state, representing ~68% of Clover's total sales.

Bermudez's LinkedIn profile shows that prior to joining Clover in 2012, he worked at brokerage firm B&H Assurance, where he held the title of VP of Sales Operations. The profile indicates he left the role in 2012 upon joining Clover.

The most recent New Jersey corporate records, dated November 20th, 2020, indicate that Bermudez is not only still active with B&H, but is listed as the sole agent of the firm, as well as one of two principals.

B&H, which stands for *Bermudez* & Henson, operates what is known as a Field Marketing Organization, or an "FMO". FMOs act as a middleman between insurance companies and brokers, negotiating sales deals with the insurance companies that a network of agents can then offer and sell to customers.

As one former employee explained, Bermudez never left B&H, and instead was brought on specifically to use his brokerage business to grow Clover's sales.

"He was brought into Clover since early on, like day one, and because he had such a large ground force of sales agents he was key and instrumental in getting Clover started."

"He's got both feet in those waters; one is he's head of sales at Clover and the other one is he owns and manages this massive sales market foundation in the Northeast under his FMO."

A review of the B&H website shows that it is partners with Clover, yet we see zero disclosure that its key principal holds a concurrent senior role at the insurance company. One might expect this to be the type of conflict of interest that seniors purchasing Medicare would be interested to know.

\* \* \*

Despite B&H clearly doing business with Clover, we saw no mention of the apparently significant related-party transactions in Clover's SEC filings, including in its go-public prospectus.

\* \* \*

When we spoke to a former employee about B&H's relationship with Clover, we were told that Bermudez had taken steps to conceal the relationship in the run-up to the go-public transaction due to "compliance reasons":

"He just had to hand his business over to a partner, then he'd removed his name on it for compliance reasons."

"His wife is listed as the co-partner with his business partner. He had to get his name off of it, but you know like there's gonna be a check from Clover going to that business every year. It's gonna be a large amount—he makes good money at Clover. He makes the majority of money from the sales that his business makes from Clover."

We reviewed records from the National Association of Insurance Commissioners ("NAIC"). On the NAIC page for B&H Assurance, the entity listed its formal relationships (i.e., appointments) with most major insurance companies in New Jersey, 17 in all.

Clover was noticeably absent from the list (despite clearly appearing as a partner on the B&H website, as shown above.)

\* \* \*

On Bermudez's wife's NAIC profile, we see that she has a formal relationship with only one insurance company: Clover Health.

17

In short, Clover's Head of Sales appears to operate a large, separate insurance brokerage firm that does significant undisclosed business with Clover, through his wife's name. Clover then claims in the very first pages of its go-public prospectus to be generating its business organically due to its amazing software. [Pg. 1-2]

36.    The report provided evidence that Clover was engaging in other unscrupulous sales practices, including handing out gift cards to generate patient leads and paying staff at physician's offices for referrals.

37.    The report alleged that Clover was exposed to significant risk because its software product was designed to encourage "upcoding," or making patients seem sicker than they truly are in order to secure a higher coverage reimbursement from Medicare Advantage:

But upcoding happens to be a key issue that has drawn the attention of the Department of Justice, according to a former employee we interviewed, who provided a copy of the Civil Investigative Demand.

The former employee said they were questioned about "this tool (Clover Assistant) and its practice of promoting higher level coding by the physician so that way the insurance can bill CMS."

*      *      *

Our research indicates once again that the DOJ probe is likely onto something.

While Clover claims its software tool, Clover Assistant, is aimed at helping doctors improve patient care, former employees told us that it was first and foremost a coding tool. According to one former employee:

"The core feature of the platform is it increases revenue by identifying chronic conditions that people have and CMS will pay that…That's the core business proposition."

They further explained how it works:

"What it's doing is saying we have your claims and in your claims at some point some doctor diagnosed your hypertension. The doctor that's sitting in front of you right now, we want them to say that you have hypertension. The doctor can say

18

'yes' or 'no' based on their findings. But it's a sort of a nudge to the doctor to identify these potential chronic conditions you have."

Per another former employee we interviewed:

"If you make this patient look really, really sick, you are going to get more money from the government…I think the government may say it's not bad if a patient really is that sick. It gets dicey when you have a program that you are paying doctors straight up crazy amount of money to log in to and do this for you."

As we will detail later, Clover pays providers $200 per visit to use the Clover Assistant. One former employee explained how the payment is essentially an investment for Clover, given the potential to increase diagnosis codes and earn higher reimbursement:

"If you are paying doctors $200 for a click but you are able to increase the severity of patients that you've diagnosed, it's worth it because you are drawing down thousands of dollars (from Medicare) for a couple of clicks. To me that's why they have this."

\*        \*        \*

Clover's drive to capture every possible diagnosis has, predictably, led to messy results.

Note that capturing *relevant* prior diagnoses is a perfectly acceptable practice. But according to doctors we interviewed, Clover Assistant retains old and often irrelevant diagnoses, ultimately leading to wasted Medicare dollars.

Per one doctor who works at a NJ practices that has dozens of doctors using the Clover Assistant:

"[Clover] is like constantly throwing those codes back in our face for everything that's ever come up when they are irrelevant now."

The doctor distinguished Clover from Athena, the electronic medical record (EMR) system used by the practice for its patients, which also prompts doctors to consider confirming diagnoses based on information gathered on the patient. The doctor described Clover as being much less precise:

"They have all these ridiculous diagnoses in there that make no sense…Every single time I go in more than half the diagnosis aren't right…Whereas with Athena, I would say you know 4%-5% of the time the diagnosis aren't right."

Another doctor estimated that Clover Assistant's patient records were inaccurate between 10% and 25% of the time, adding:

19

"Let's say somebody came in with diabetes. They lost a bunch of weight. They exercise. They don't have diabetes anymore. *That diabetes is still on the record.*"

We asked why some of these cleared up/cured legacy issues continue to show up as diagnosis. **The doctors explained that the software limits their ability to remove an inapplicable diagnosis** and expressed some confusion why such an obvious feature hadn't already been implemented:

One doctor told us:

"Your patients don't necessarily fit into one of their boxes, but you have to click a box to get to the next screen."

The doctor added:

"I can't click past the screen. But maybe this (diagnosis) is no longer applicable for this patient… **If there was just a spot to say this is no longer applicable, then I think the software would be improved instantaneously. And it is an easy thing.**"

[image omitted]

Another doctor we spoke with described how the Clover Assistant did not allow her to remove a current COVID diagnosis for a patient who had recovered from the virus but was taking a long-term course of medication to prevent blood clots, which the patient had experienced when ill with COVID. The system had been incapable of specifying the difference between a previous and current diagnosis.

"The menus are so unspecific that from what I checked, they could think that he currently has active COVID which he doesn't have."

It is unclear whether the difficulty doctors were having with removing old irrelevant diagnoses was part of a strategy to increase risk assessment scores, clunky development, or both. From the perspective of CMS, the distinction may not matter. Illegitimate increases in a patient's risk score can lead to penalties and regulatory sanctions. [Pg. 37]

38.     The report also revealed that Clover paid physicians $200 per visit to use its software, and that the software was "embarrassingly rudimentary." Only a small percentage of doctors that were "onboarded" were actually using the software, as the report explained:

Clover tells investors it has "built a broad base of engaged physicians" and that "onboarded PCPs (primary care physicians) used the CA (Clover Assistant) for 92% of eligible visits in 2019." [Pg. 14]

This 92% figure appears to be a clever turn of phrase. Clover never defines "onboarded" in its prospectus. [Pg. 247] In the field, Clover designates some doctors as "Clover Preferred", or "a primary care physician who has been recognized for their dedication to using the Clover Assistant tool." Two former employees explained that only "Clover Preferred" doctors were using the Clover Assistant.

But the proportion of "Clover Preferred" doctors is quite low. For example, according to Clover's own database, only ~45% of all in-network doctors in a key New Jersey market, Passaic County, are defined as "Clover Preferred".

In another key market, Morris County, New Jersey, only ~25% of all in-network doctors are "Clover Preferred" providers.

A former employee explained that Clover was able to enroll about 70% to 80% of all the primary care doctors in New Jersey into its network, but that didn't translate into a high percentage of Clover Assistant users:

"They had a good portion of doctors in the state but not a great portion of doctors were using it if they enrolled."

The acceptance rate drops dramatically outside of New Jersey, according to our review of Clover's database.

- In El Paso, Texas, for example, the Clover directory lists 110 doctors in Clover's network and only 8 that are identified as Clover Preferred doctors.
- For Tennessee, we found 220 primary care doctors in Clover's network but none who identified as Clover Preferred providers.
- Arizona has 206 in-network providers but we found no Clover Preferred doctors.

It seems Clover is using claims about a small subset of its network, "onboarded PCPs," to give the impression of widespread acceptance of the Clover Assistant.

We emailed the company asking for clarification on this "onboarded" metric and have not heard back as of this writing.

21

39. On this news, Clover shares (CLOV) fell $1.72 per share, or 12.3%, to close at $12.23 per share on February 4, 2021, and Clover warrants (CLOVW) fell $0.18 per warrant, or 5%, to close at $3.39 per warrant on February 4, 2021, damaging investors.

40. On February 5, 2021, before the market opened, the Company filed a Form 8-K disclosing that the SEC was conducting an "investigation and requesting document and data preservation for the period from January 1, 2020, to the present, relating to certain matters that are referenced in the [Hindenburg Research report]."

41. On this news, Clover shares (CLOV) fell $0.53 per share, or 4.3% during intraday trading on February 5, 2021, and Clover warrants (CLOVW) fell $0.28 per warrant, or 8.2% during intraday trading on February 5, 2021, further damaging investors.

42. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Clover securities publicly traded on NYSE and NASDAQ during the Class Period and/or pursuant to the Registration Statement issued in connection with the Business Combination, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Clover, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Clover securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Securities Act and Exchange Act were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Clover;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused Clover to issue false and misleading SEC filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings;

- whether the prices of Clover securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

49.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Clover shares met the requirements for listing, and were listed and actively traded on NYSE and NASDAQ, highly efficient and automated markets;

- As a public issuer, Clover filed periodic public reports with the SEC and NYSE and NASDAQ;

- Clover regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging

public disclosures, such as communications with the financial press and other similar reporting services; and

- Clover was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

50.    Based on the foregoing, the market for Clover securities promptly digested current information regarding Clover from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

51.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

52.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

53.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

54.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Clover securities during the Class Period.

56. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Clover were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Clover, their control over, and/or receipt and/or modification of Clover's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Clover, participated in the fraudulent scheme alleged herein.

57. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Clover personnel to members of the investing public, including Plaintiff and the Class.

58.     As a result of the foregoing, the market price of Clover securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Clover securities during the Class Period in purchasing Clover securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

59.     Had Plaintiff and the other members of the Class been aware that the market price of Clover securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Clover securities at the artificially inflated prices that they did, or at all.

60.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

61.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Clover securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Clover Individual Defendants and the IPOC Director Defendants

62.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

27

63.     During the Class Period, the Clover Individual Defendants and the IPOC Director Defendants ("Individual Defendants") participated in the operation and management of Clover, and conducted and participated, directly and indirectly, in the conduct of Clover's business affairs. Because of their senior positions, they knew the adverse non-public information about Clover's misstatement of revenue and profit and false financial statements.

64.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Clover's financial condition and results of operations, and to correct promptly any public statements issued by Clover which had become materially false or misleading.

65.      Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Clover disseminated in the marketplace during the Class Period concerning Clover's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Clover to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Clover within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Clover securities.

66.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Clover.

**COUNT V**
**Violation of Section 11 of the Securities Act**
**Against All Defendants**

67.     Plaintiffs repeat and re-allege each and every allegation contained above.

28

68.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against Clover, the Clover Individual Defendants, and the IPOC Director Defendants (the "Section 11 Defendants").

69.     The Registration Statement for the Business Combination was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

70.     Clover is the registrant for the Business Combination.  The Section 11 Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

71.     As issuer of the shares, Clover is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

72.     None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

73.     By reasons of the conduct herein alleged, each Section 11 Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

74.     Plaintiffs acquired Clover shares pursuant and/or traceable to the Registration Statement for the Business Combination.

75.     Plaintiffs and the Class have sustained damages.  The value of Clover common stock has declined substantially subsequent to and due to Section 11 Defendants violations.

**Violation of Section 15 of The Securities Act**
**Against the Clover Individual Defendants and IPOC Director Defendants**

76.     Plaintiffs repeat and re-allege each and every allegation contained above.

77.     This count is asserted against the Clover Individual Defendants and IPOC Director Defendants (the "Section 15 Defendants") and is based upon Section 15 of the Securities Act.

78.     The Section 15 Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Clover within the meaning of Section 15 of the Securities Act.  The Section 15 Defendants had the power and influence and exercised the same to cause Clover to engage in the acts described herein.

79.     The Section 15 Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class at relevant times.

80.     By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 5, 2021                    Respectfully submitted,

_s/**Paul Kent Bramlett**_
PAUL KENT BRAMLETT
TN #7387/MS#4291
ROBERT PRESTON BRAMLETT
TN #25985
Bramlett Law Offices
P. O. Box 150734
Nashville, TN 37215-0734
Telephone: 615.248.2828
Facsimile: 866.816.4116
E-mails:  PKNASHLAW@aol.com
                 Robert@BramlettLawOffices.com

*Attorneys for Plaintiff*

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
           pkim@rosenlegal.com